the fourth district appellate court of the state of illinois has reconvened the honorable peter c cavanaugh presiding thank you good morning call case number four dash two four dash zero five nine three aladdin donnell versus ryan and nolte md at all counsel for the appellant if you please state your name for the record lauren michael lagaretta on behalf of the plaintiff thank you and for the appellee adam chaddock on behalf of the defendants appellees thank you mr lagaretta you may proceed thank you uh your honor here the trial court accepted a version of facts uh that was respectfully in the light most favorable to dr king not the patient plaintiff and ignored documented physician involvement decisions that directly affected this patient's care uh put simply the medical records present one set of facts the doctors another their shared physician yet another and the plaintiff have blended them all this equivocal or muddied communications um bears resemblance to the very fact intensive uh appellate cases that i've cited like bovara for instance where the communication i think in bovara it was you know the consulting physician was asking about whether it was possible the sorry the treating position asked if it was possible the consulting physician thought it was about feasibility there was a communication uh and there were two different versions of the facts here mr donnell had extensive and inclusive clots in his legs he went to a local hospital that local hospital told him he needed a surgical procedure and sent him by ambulance to a second hospital that second hospital also told him he needed a procedure and also sent him by ambulance to the third hospital at that third hospital mr donnell came under the care of dr nulty and not yet board certified vascular surgeon um who was sure whether he's even performed this type of procedure prior to mr donnell's involvement it's undisputed that mr dr king was on staff and was identified by osf uh st francis as the consult during uh mr donnell's admission and i think i have a citation of the document production on that to the record it's c642 now when mr donnell came under the care of dr nulty dr nulty came to him and said you can go home um you just need to take a pill and what is documented in the medical records which is again what sets this i think unique from the cases cited by defendants in that uh mr donnell quite clearly after getting the recommendation about taking the pill requested a second opinion from another doctor and possible transfer due to these conflicting plans from the on treatment course that's what's directly can i stop you there once that request for a second opinion is made what is the hospital policy and procedure sure and and so the hospital policy and procedure in place and what the evidence has revealed is that uh dr nulty was required to to enter an order he did not do that um that being said what he did document was obtaining a second opinion uh in his note i was reading from the initial note just now your honor uh was one of the other health care providers dr nulty's own notes states patient wanted a second opinion so we discussed with dr pin uh dr king he was of the opinion of the same opinion that this patient was best to have first-line therapy and that's the pill that we've been talking about we recommend we reviewed now council uh accuses me of manufacturing a dispute of fact on this we um and frankly i don't mind the charge because it admits that there's a genuine dispute of fact on here the medical records quite clearly documents we miss kennicky miss kennedy the advanced practice nurse unequivocally testified she does not control a course's patient of treatment uh she is not the appropriate person to review images or make decisions um i would submit that that's a fact issue that the jury could infer from the medical records that the we that is reviewing and recommending was dr king now uh i know the trial court points to the audit trail um that is again one version of the facts it is undisputed that dr king himself did not go to a portal and go into the patient's medical records to look at images that does not in any way uh obviate or as a matter of law require a finding that he did not at all look at the again well let me ask you this council let me let me just cut in i'm sorry no no but um what evidence other than dr king's name appearing in note number two suggests he had anything to do with the client and and i want you to also address the fact that the policy and procedure isn't followed and by a the formality of an order for a second opinion can you tie those two together for me and tell me what evidence you have your honor again what evidence we have is the patient's testimony that is in line with the the medical records that he did indeed ask for a second opinion from a second doctor we do have his testimony that dr nolte came in and said yes the second opinion doctor agrees with me and we do have dr nolte's notes where he says we and we what other evidence i have i have testimony in medical records and and that is the extent of it it is uh i believe your honor still a an issue for the best left for the jury as to uh whether or not he in fact reviewed and he's going to say that he doesn't remember to be clear it's not that his testimony is i don't i didn't provide a second opinion here uh it's i don't it was i don't remember that well any any involvement was somewhat limited based upon the fact so that's somewhat understandable but what i'm sort of harking on now is the procedure yes and it's they're supposed to be some formal order with regard to the second opinion and i think that's lacking here i'm just wondering how that affects all things that would have come after the formal order i understand that i mean it's certainly undisputed that that he did not do per hospital i mean it's it's undisputed that the plaintiff or the patient asked for a second opinion it's undisputed that the osf policy requires that the doctor treating him enter an order why is that required because it does then require dr king the second opinion to have a much more uh we're not having this conversation because then it's a patient physician relation he has to put hands on the patient he's got to get into the patient records this case is not that that that is an instance where patient position relationship is not disputed this is a special relationship uh exception uh that we're going to and so that's why i think the policy respectfully is i don't want to call it a red herring but the policy would is is not um is not i guess uh dispositive on the issue of whether or not there is a factual issue here um based on the record it's based on the testimony as to whether or not dr king was in fact sought out for a second opinion and whether or not that second opinion i i think it's undisputed absolutely changed this patient's care it affected his care he heard then he didn't go to a fourth hospital the patient got another doctor's opinion and mind you again it's not disputed that dr king had performed hundreds of these procedures and dr nolte had performed none so i think the jury could infer from all of this that of course dr nolte who was fumbling through the best practice advisories and a very young new doctor who's not performed that procedure went to the on-call uh doctor for him to consult with dr king and said dr king you know this is the facts that i have in front of my case here's the imaging that i'm looking at um he's being told that he needs this surgical procedure do you agree and it comes back and he documents that dr king was of the same opinion the doctor recommended the same thing so this patient's care was absolutely impacted by the role that dr nolte claims that dr king played um it is i i believe the very definition of a question of fact here for the jury now they make very well side with everything that defense counsel points to uh there was no order he doesn't he's not in the audit trail uh he doesn't remember this if it were more of a formal thing he would expect x y and z but those are all i think factual issues now defense claims again that's their version that he was he was not seeking out a consultation but a but a curbside consult and what's absent from the record among other things excuse me counsel but that's really what we have here is it not an informal conversation um by dr nolte uh with dr king um based on all this um the the facts that you talked about and your answer to justice kavanaugh's question there really was no participation in the patient's treatment here and that is what distinguishes this case from the three that you relied on bovara slanger and blogged in right i mean slanger um the er doc there signed off on the patient's care that is the the discharge by the nurse practitioner blogged in uh the the doctor who consulted with the plaintiff's doctor was the on-call physician and reviewed plaintiff's tests collaborated with uh the the plaintiff's doctor regarding hospitalization or not we don't have any of that here and so um i i'm i would respectfully disagree to that point we do wonder how these all right so why don't you respond i don't know how these cases then would help us uh with uh the case before us because of the distinguishing features and facts sure i in pointing to slanger i would point out that we do have an on-call physician here and i pointed to citation in the record that was produced by osf that was dr king's role we do have evidence that he reviewed uh the patient's images again dr nolte says we reviewed the images well let me interrupt for one second i don't know if we should really focus so much on because we know that sometimes people instead of i use we i mean so i don't know that we can put all of our stock in the fact that the word we was you know was used i'm saying that the stock that we put in it is that you have that is a question of fact you cannot infer or say as a matter of law that that we means the royal we and dr nolte must have been talking about himself no dr nolte did what the patient asked dr nolte documented that the consulting physician the on-call consulting physician did review and did collaborate in the extent that he recommended and agreed with the same course of plan which left the plaintiff with permanent harm that he suffered there um i i would submit that the semantics there point to why this is a fact uh issue and not an informal consult again curbside consult or informal consult are nowhere mentioned in the medical records what's mentioned is a second opinion uh what is documented is a second opinion doctor who reviews medical records or sorry imaging reviews imaging and is agrees and is of the same opinion that the patient's supposed to have a pill uh i think that respectfully these are the very essence of questions that a jury and it very well a jury might think like you and say well i think dr nolte you know the plaintiff's making uh semantics out of the we and i think the we he must have messed up he must have been referring to himself or maybe somebody else i don't think it was dr king i think dr king seemed credible and i think that he you know he says he didn't look at the records i know that the medical records say that we reviewed the images um and again the semantics of the we following a patient requesting a second opinion and the doctor documenting that doctor's name dr king i think that we again is there might be a jury a member who says um your honor i disagree i think that we means that dr king absolutely was uh consulted on this this uh case by dr nolte who who did not have that experience who went to a guy who had experience and asked him what he thought um so i i don't think not constrained all right i know are we not constrained by the hospital protocol not being followed here with regard to a second opinion no why not because i think because i think that that policy then obviates the issue that the policy itself if it's followed there's a strict patient physician relationship on on there is no argument about implications uh that the court has to infer about a special relationship now we what we take from reynolds is that the court will imply or take implications from both the patient consenting to it right as well as the involvement of the physicians uh uh in the patient's care whether it affected the care whether he was actually consulted and on that point i think again all of the cases are very fact intensive i think you do bring a point that none of these two are really unique or or are the same but i think the blend of what you can from slinger as you mentioned or what we can take from uh blagdon that says that we can't ignore what you know what actually you know i forget the line when they're talking about public policy um but but switching again to bavara bavara was the treating physician saying hey consulting physician uh do you think that this uh this procedure is possible and the truth and the consulting physician says no i thought he was asking about whether it was feasible um that equivocal muddied testimony was very crucial there and communication there was crucial and because of that equivocal testimony back and forth the court said listen i can't find this as a matter of law this is set this is like that case in which where i respectfully don't think the trial court can say that it was an informal counsel there's certainly evidence that it was an informal counsel but there's also evidence that it was a second opinion um just as there's evidence that he didn't review or go into the audit records but there's also evidence that the doctor nothing says that he reviewed images um we have competing stories i think and i think when we have competing stories based on the record based on the testimony i think the the case law says that that equivocal nature means that a jury should infer and that this should be left for the jury counsel if i may in page eight of your brief you say like slanger dr king is documented to have signed off on the medical plan for mr donald yes yes what document are you referring to where dr king signed off sure um in the signed off portion of it um is from dr nolte's medical record again it's not something dr king did even though you've stated dr king is to have documented the sign-off it's something dr nolte in the note that we've been discussing i just want to make sure i didn't know no you did not miss it and you hit the note on the head is what i'm borrowing is the corollary from slinger that he was one we have documented that he was the on-call position and that it signed off on i'm using the colloquial phrase what i mean there is that he agreed with the plan and we do have documentation that dr king agreed with dr nolte's take a pill uh recommendation um and so based on that i i do think it is a fact issue about whether or not he signed off now again he didn't sign a medical record but there's there's no dispute that he did not sign off on a medical record he did not himself go in to the patient's medical record but what is documented is him signing off and agreeing on dr nolte's opinion which then was relayed back to this patient and relied on by this patient i would say that in this case the testimony is anything but unrebutted it's certainly not clear and free from doubt i believe the summary judgment standard is a drastic one and if there are reasonable persons who can draw divergent inferences based on these records based on what they testify based on the semantics of wheat uh i believe it is it is improper to find as a matter of law uh as the trial court did here um i will reserve my five minutes i don't know where i am about it says 11 21 and i think he started pre on time so i think i'm running up to my 20 minute moment there's three minutes remaining o'clock so if there are any other questions um that the can reserve um my five minutes i think that's pursuant to to to rule that i have that five minutes but we will have five minutes in rebuttal okay um well then i i think i've said um what i came to say i really appreciate everyone's time thank you for your your astute questions thank you counsel chad good morning your honor i want to start with what plaintiff seems to hinge on which is this idea of we and what it means my my first and initial point was going to be that exactly what the justice already said is that uh dr nolte was using we in the royal royal we sense that he was using it collectively but as i'm preparing for this argument this weekend i came to two alarming conclusions one the discharge summary upon which the plaintiff relies for much of his is not a part of the record on appeal so to the extent that the court relies on this this uh uh information about we i would ask the court allow me as the defense to supplement the record to include the discharge note on the record on appeal i of course have it up and i can share my screen i don't know if that's something that the appellate court would allow but i do want to point out that the second alarming thing i found about this discharge note as i was preparing this weekend is that plaintiff fundamentally represent misrepresents the discharge note on page four of his appellate brief his first brief he has two screenshots of notes from the discharge order if you view them in the order that he has them posted maybe there could be some inference that dr king looked at some sort of testing or records unfortunately he has cited them out of order he has them flip-flopped the real order is that uh his second screenshot should be first and so why is that important well it's important because dr nolte's discharge note goes literally it linearly it goes in a timeline format his discharge summary in history starts with aladdin donald was a 47 year old caucasian male with a history of a recent rotator cuff repair with dr joseph uh he states he noted swelling and then went to gibson hospital ivy filter insertion by dr jesse vanley on february 1 2018 he was transferred for consideration of dbt lysis and here's where it gets important we reviewed the images and felt that he was most appropriate for first-line therapy naralto for minimum of three months of treatment that weed comes before there's any ever any reference to dr king now the next sentence says the patient wanted the second opinion but we also discussed with dr king i think that kind of pulls out any suggestion that this weed who reviewed the images was dr king that note about reviewing the images and determining the appropriate treatment course in fact came before reference of the second opinion before reference of dr king being involved in the care so whatever weed dr nolte was using whether it was he and his nurse practitioner or whether it was the rural use of weed it clearly wasn't dr king so that usage of the discharge note it is just a bit misleading um i do want then to kind of look at the facts of from a 30 000 foot perspective but the plaintiff was transferred to osf by dr vanley from the outside hospital uh the patient was transferred for consideration of bronco lysis for a dbt and the co-defendant dr nolte was the attending and admitting physician for the patient when he was transferred dr king played no role of any kind in the transfer of this patient when the gets to osf st francis dr nolte and his service the vascular surgery service did all the work up they did the history physical they did the physical examinations they ordered the test the labs etc dr king played no role of any of that um dr nolte based upon the history the physical exam the labs the testing etc he reached the conclusion that a medical uh management through medication was more appropriate than franco lysis he's made this decision before he ever talks to dr king he has already decided on the course of treatment care he takes that course of treatment to the to the uh patient and the patient says well dr vanley the other hospital said i needed license i want a second opinion okay again up to this point no interaction with any kind um so then after the patient requests a quote-unquote second opinion uh apparently dr nolte had some interaction with dr king i think it's important to note that dr nolte doesn't remember this interaction or if it even occurred dr king doesn't remember this interaction or if it even occurred and ap and kennedy dr nolte's advanced practice nurse doesn't remember if this conversation actually occurred or what happened so no no medical provider has any memory of this conversation or can even say it happened um so the trial court did give deference to the facts to the plaintiff in the light most favorable to the plaintiff in that the trial court assumed that a conversation happened because none of the doctors can even say that that conversation happened um so then we get to this discharge note which again plaintiff used out of order and after the paragraph that talks about we reviewed the images and felt the most appropriate line of therapy then they come to the only time dr king's name is seen in the chart the patient wanted a second opinion but we also discussed with dr king he was of the same opinion that this patient was best to have the first line of therapy audit trail proves dr king never got into this chart he never looked at any tests he never looked at any lab results uh he he didn't look at the history and physical he didn't look at the records from the heart hospital the audit trail proves all that and the plaintiff in his deposition agreed with me that he had never seen dr king he never spoke to dr king dr king never came into his room to provide some sort of examination or um uh discussion with this patient so that that leads us to the idea of was this a formal consultation was it a formal second opinion i know dr nolte called it a second opinion in his in his uh uh or the nurse called it the patient wanted a second opinion but simply because the nurse or or dr nolte might have called it a second opinion doesn't mean that it was a true second opinion as as the court's already discussed osf has very formal rules about consultation if dr nolte wanted a formal consultation with dr king he just had to put the order in and once the put in that triggers a whole ramification of processes dr uh king would send his nurse practitioner uh to see the patient they would review the prior medical records the history and physical and all the medical records from the admitting physician dr nolte then dr king would come and examine the patient and then they would enter a consult none of that happened here in this case there was no formal second opinion um and to the extent that you want to say was there an informal second opinion i don't think so really either um because all all dr king apparently did from the records is to say no i think you've got the right course of care so um i think um all of the cases in this case it's a rare time that i'm before the appellate court when i can say i think all the cases support and the reason i think that is the cases that find that there's physician patient relationship support dr king in this case and the cases that do find a physician patient relationship that the doctors in those cases had so much more involvement in the care there were a lot of affirmative actions that led to that position being uh deemed to have a physician patient relationship um and i just i think it's important to talk about the very uh base definitions of the physician patient relationship um a position duty arises only when a physician patient relationship has been expressly established or there is a special relationship the special relationship cases have been in the context of like pathology or radiology where pathology is taken out of the patient the pathologist never sees the patient but the pathology goes to the pathologist to review and interpretation or there's imaging done of the chest the radiologist reads the chest x-ray that never sees the patient that's the structural relationship context um and the case law the lenahan case in particular says that for a physician relation patient relationship to exist the physician must take some affirmative action to participate in the care of the patient that is entirely and totally absent here um the cases when you view them as a whole look to things like ordering tests reviewing tests interpreting lab results interpreting imaging results or having direct control over the supervision of the care none of that occurred here right dr king had no supervisory um uh supervisory control over dr nolte dr nolte didn't have to do anything dr king said um dr king didn't look at any tests lab results images he didn't order any tests lab results or images he didn't order any medications he didn't order any particular line of treatment so all of the things that the courts have traditionally looked at to see the physician patient relationship exist are entirely absent in this case um i think the reynolds case is exactly on point uh the reynolds case is where a two-year-old came into the emergency department after a fall from a couch uh the ed physician involved the pediatrician uh and the pediatrician um then called at 2 a.m a neurosurgeon and said look we've got this two-year-old that fell off the couch here's the symptoms here's the test result the neurosurgeon in that case did more than dr king did in this case and was still found not to have a physician patient relationship the neurosurgeon the reynolds case listened to the the spiel from the uh pediatrician who was calling at 2 a.m and instead of just saying no i agree with your treatment he recommended a whole new line of investigation specifically he recommended a spinal tap after recommending the spinal tap during that 2 a.m phone call the neurosurgeon had no further uh contact with the patient and in that case reynolds said merely recommending the spinal tap while taking the phone call is not enough to create a physician patient relationship here dr king didn't even do that he didn't recommend some other course of treatment that wasn't already anticipated or expected by the uh treating physician also i think it's important to note that um in the reynolds case the pediatrician had left a note to consult with dr fulbright the neurosurgeon the next morning but because of some sort of clerical error that did not occur right that's kind of analogous to to the argument here that well if only he would have entered uh an official order dr milky would have entered that order for consultation then then dr king would have been able to consult well but he didn't he didn't order the order the formal consultation and so dr king wasn't able to consult in the normal manner same thing happened in reynolds dr the pediatrician overnight wrote an order for neurosurgeon to consult in the morning but that never got conveyed to the neurosurgeon and that can't be held against the neurosurgeon just like dr nolte not uh going through the appropriate processes cannot be held against uh dr king in this case the widespread brush case i think is also hugely helpful in that case the patient came into the emergency department and the ed physician contacted the on-call psychiatrist to arrange follow-up care for the next day um the ed physician discussed with the psych psychiatrist the presentation discussed that the patient had refused an admission and wanted to get the patient in to see the psychiatrist uh merely taking a phone call and listening and or agreeing to the plan did not cause the psychiatrist in Weisbruch's rush to be deemed to have a physician patient relationship i'm going to skip ahead because i think it's repetitive i want to skip to a couple of the plaintiff's cases the so-called plaintiff's cases i think are pretty helpful to me honestly um the the mackie case i think presided by the plaintiff that's the case where the ed physician paged the urologist after identifying the kidney stone in that case the ed physician physically needed a doctor of a different special you couldn't treat the kidney stone right that's not what we have here dr uh dr nolte could do the lysis if he decided to do the lysis and he could prescribe the medication he didn't need dr king to do either one of those things in mackie that ed physician needed the urologist um the court also noted in mackie that the uh urologist had a contractual obligation and was compensated for his consultations there is no evidence in this record that dr king had any kind of contractual obligation or that he was compensated for his consultations in fact there's no evidence that sera ever billed for this patient right dr king did not bill for this patient um also in the mackie case the urologist was deemed to have a physician patient relationship because he ordered medication he ordered flomax again dr king made no orders at any time certainly didn't order a medication and didn't prescribe any particular treatment course so again even though the mackie case found that there was no physician patient relationship i think it completely supports my case and that is to say that where there's evidence of active participation like prescription medication um or having a contractual obligation then there might be a physician patient relationship those things are entirely absent from this case uh this the the slinger case again i think favors me in slinger a nurse practitioner saw the patient in the emergency department uh the doctor dr collins in that case was an ed physician the patient could not be discharged from the ed without the ed position reviewing the history of physical the exam results the labs and agreeing with the nurse practitioners uh view of the case the patient could not be discharged without the ed physician signing off that's not the case here uh dr king had no supervisory authority over dr nolte nolte could seek treat this patient in any way he wanted to so slinger again i think supports me um bolvera i think it's another good one that supports me in bolvera the cardiologist asked two of his interventional cardiology partners to review an angiogram to determine whether or not angioplasty would be appropriate uh the case made absolutely clear that was the regular routine and um procedure the cardiologist was not qualified to read the angiograms so the two interventional cardiologists read the angiograms and offered an opinion on whether angioplasty was appropriate again there was no procedure in place here that suggested that dr king had to take uh consults from dr nolte or that he was contractually obligated to do so or that he was compensated to do so um and again he didn't review anything like an angiogram dr king did dr king didn't look at any of these so uh for that reason i think bolvera it supports me and then the last case because i know i'm being repetitive and i apologize but the last case that i'll touch on because i think it's supportive is the blagdon case again blagdon is a case where an ed physician called the on-call primary care physician the primary care uh physician was called because he couldn't admit patients and the ed physician couldn't okay so the the primary care physician who was on call and was called in that case and found to have a physician patient relationship was the one that had the final say on whether the patient could be admitted he had the final authority on whether the patient was admitted again dr king had no such authority over dr nolte over this patient's treatment course or anything like that so i do think that the case law is entirely favorable to the defendant and finally uh the reynolds and the reynolds court and the comfort court noted what a chilling effect it will have on doctors and patients if we say taking a phone call or bumping into someone in the hallway exposes a doctor to liability it will have a stifling effect on communication amongst physicians it will have a stifling effect on the exchange of information and medical knowledge and and that's bad for the physicians and that's bad for the public bad for the patients so for all of those reasons uh we think that there are no facts that suggest that a physician patient relationship could uh be imputed upon dr king when he had no involvement of any kind he had no affirmative action or involvement in the care the treatment etc and again i want to go back to the discharge summary because i'm so concerned how it was used out of order in the appellate brief i would urge that the discharge summary should not be relied upon by the appellate court for their decision but if you determine that it's appropriate to rely on it i would very much like to supplement the record with that so you can read it in full and in the correct order not out of order so for those reasons uh unless you have any questions for me judges i have nothing for you any questions thank you counsel all right the felon has five minutes in rebuttal but if i could i would just prompt you uh perhaps you could address the use of the word we and the timing the involvement of dr king your honor are you addressing that question to me yeah you have five minutes in rebuttal and i just thought i'd prompt you on this this one question that was brought up early and attorney chaddock's argument with the use of the word we and the timing with with uh dr king's involved again all mr chaddock is doing is presenting a version of facts that is favorable to his client uh what he did not say was that that screenshot was not from the discharge note the discharge note was the last note that dr nulty prepared and the discharge note was made after the second opinion was garnered so his use of the word we through his discharge summary is his counsel says he's he says he's writing it linearly that's not testimony that that was elicited um but even if uh again the order of it is is not relevant the order is that they were both in the discharge note and i uh screenshotted also the the interdisciplinary note which came before that the course of care here was he came into dr nulty's care dr nulty saw him said get take a pill patient says to interdisciplinary team i want a second opinions uh that is documented that second opinion doctor sorry dr nulty was notified that's also in the record dr nulty was notified and so he prepares a discharge note after seeing the patient after seeking the second opinion and discharging the patient he's writing out an entire note about the course of care of aladdin from his resentment through his discharge so his use of the word we again is a fact question uh and the order does not matter the use of the word we alone on on the on the we reviewed the images we recommend dr king is of the same opinion again it's all there there are all facts that can be drawn in the light i believe a jury could draw those lights in the favor to the plaintiff uh the affirmative act again none of these cases the defense is talking about is there any documentation of a second opinion uh as documented in the record so none of those cases say anything similar to the fact pattern here where dr nulty undisputedly documented a second opinion sought obtained and relayed to the patient by dr king none of those cases say anything about it in fact in reynolds the pediatrician did not specifically ask the evidence whatsoever that there was a second opinion requested right all of these cases are about was it an informal bump in the hallway by the way this was not a bumping in the hallway informal meeting this was a second opinion that was requested by a patient and was documented by the treating physician dr nulty of obtaining that second opinion so uh it wasn't a and the informal uh conversations that where reynolds and by the way he points to the supervisory role again that that has and the fact that this patient was not seen and did not review records in bovera in bovera in fact the patient uh as we talked about um the patient was never seen by the interventional cardiologists um never had any hands on them um and there what was central to the case was whether a jury could find that the consulting vision knew or should have known that the medical opinion about the plaintiff's course of treatment or care was likely to be passed on by the patient to the treating physician by the treating physician and would be crucial to that patient of note there the consulting physician also never reviewed any of the patient's medical records and had any contact with the patient but central to the finding of a question the fact in that case was this equivocal muddy disconnect between the treating and the consulting physician um we have that here we have a disconnect we have equivocal testimony on this point and i'll point to just the last little point the council had mentioned about contractual obligation again osf's document production and i cited to that in my brief uh i think it's c642 shows that he was the only guy on call and again it's undisputed that that dr nulty was was was it not yet board certified had not uh likely performed the procedure before and his own testimony when asked was why did you know why were you consulting dr king dr king and his group also performed thrombolytic procedures and i wanted dr king and his group to review it and to see if they thought they would want to perform that procedure and i have a site of that c603 so what we have here are two different versions of the facts we have what summary judgment should not be granted on when you have two different sets of facts one supplanted from the records and the inferences there from and the implications that those records have and the other from the i don't know i don't remember um this feels like a curbside informal opinion i mean that's me that's the case okay thank you counselor your time is up thank you both for your arguments the court will take this matter under advisement now is in recess